**Deidre WARRINGTON, Appellant,**

v.

**Ross L. WARRINGTON, Respondent.**

**No. WD 35208.**

Missouri Court of Appeals,
Western District.

Oct. 23, 1984.

Motion for Rehearing and/or Transfer to
Supreme Court Overruled and Denied
Dec. 26, 1984.

Application to Transfer Denied
Feb. 26, 1985.

---

Howard E. Bodney, Overland Park, Kan., Kevin M. McCormick, Kansas City, for appellant.

Dennis E. Dibler, Kansas City, for respondent.

Before CLARK, P.J., and PRITCHARD and LOWENSTEIN, JJ.

PRITCHARD, Judge.

This proceeding began upon appellant's motion for modification of child support increasing the same for two minor children born of the dissolved marriage; for permission for appellant to remove the children to the State of California; for specifically defining and delineating visitation rights of the parties; and for attorney fees and costs incurred in the presentation of her motion. The relief requested by appellant was denied. The motion of respondent for custody of the children and abatement of child support, and to set visitation privileges, was sustained.

The parties were married on December 22, 1973. Two children were born of the marriage, a daughter on June 20, 1975, and a son on November 9, 1976. The marriage was dissolved on December 1, 1981, and appellant was granted the care, custody and control of the children subject to respondent's reasonable visitation rights. Respondent was ordered to pay $600.00 per month child support for the two children which amounts or more the trial court found that he had paid since the dissolution decree.

Appellant had done dental hygiene counselling for children in Sedalia, Missouri. After the dissolution she was employed as a secretary and receptionist in the office of Dr. Daniel Jolly, a dentist, at the Truman Medical Center, where she first became casually acquainted with Dr. William J. Beard (M.D.), who was then a patient of Dr. Jolly. Apparently, he and appellant met more formally in February, 1983, at which time they started dating. They decided to be married in March, 1983, at which time Dr. Beard was still married to his third wife, the dissolution of that marriage not being final until April, 1983. Appellant and Dr. Beard were married about the 9th of July, 1983, not having lived together before that time. At the time of trial, August 10, 1983, Dr. Beard was sixty years of age, and appellant was about thirty years his junior. At the time of his third marriage, the children of that wife were not involved, one being grown, one was in Guam with his father, and another was in college. Dr. Beard's own four children were born during his first marriage of 23 years.

Dr. Beard had graduated from Cornell University in 1947, and had training in psychiatry and internal medicine. He taught general medicine and geriatrics at the University of Missouri at Kansas City College of Medicine, and he was medical director of the long-term care facility of the Truman Medical Center. On May 1, 1983, he resigned that employment to accept a position with a Health Maintenance Organization in Long Beach, California, as director training of geriatric medicine, with some patient care. Pursuant to that move he purchased a four bedroom ranch-style home in Long Beach. He testified that in the event of his death, he had made provisions that appellant would get that house and its contents, and appellant and he planned to move to it about August 20, 1983. Appellant filed her motion to modify the decree requesting permission to move the two children to California on May 24, 1983. The Long Beach home would have separate bedrooms for the children, a separate playroom building, a yard, a separate guest room, and a patio and grill in the back. Photographs show it to be a well-kept modern home.

After Dr. Beard met the children he and appellant involved them in a number of social activities two or three weekends a month. They took them to Worlds of Fun, the Nelson Art Gallery, Swope Park, to dinner, and the children were participants in their wedding. He swam and played games with them, and he would read to them. Neither he nor appellant ever told the children to call him "Dad" or "Father", and he was not trying to take their father's place, or take them away from him. He testified that he loved the children and planned to make them a part of his life. They had never appeared to be mistreated or neglected; they were neat, clean, well dressed, healthy, mannerly and respectful, and minded appellant when she disciplined them. He observed the son's poison ivy, which he testified is not ordinarily treated because it is self-limiting, and it was much worse when respondent returned him several weeks later, it having been treated with zinc oxide which makes it worse—it does not help. The best thing to do is to leave it open and bathe it frequently which was done after the children returned, and the condition improved. Dr. Beard had never bathed with the children and he thought it would be inappropriate to do so. There were appointments made with a pediatrics neurologist and a speech pathologist in the Long Beach area for the children following trial. Dr. Beard's Long Beach home is in an area where professional people, physicians, attorneys, dentists, and people of that nature reside. The school system there is one of the best.

In support of her motion, appellant produced Dr. Roberta B. Hausman, a Ph.D. licensed to practice psychology in Missouri, with impressive professional credentials. She interviewed Dr. Beard for six hours and appellant for six hours on July 1, 1983, and a further two hour conference with them and the two children on July 7th. As to appellant, Dr. Hausman's conclusions were that she was a woman with a very strong sense of responsibility for her children; somewhat dominant and self-assured; some insecurity about the custody fight; basic good health; socially active, reaching out to people; intelligence of a borderline genius level; some problem with anger, but tends to get over it rapidly; but basically, a very solid, very reliable human being.

Dr. Hausman concluded that Dr. Beard's intelligence level was about the same as appellant's, his strengths being complementary to hers. Both were extroverted and matched in neuroticism factors, and both had better than average common sense. There was no evidence that they would not be compatible.

On August 8, 1983, Dr. Hausman spent most of the day with the two children. She administered a series of psychological and intelligence tests to them, and found that their I.Q.s were in the very above average range. She observed an articulating speech problem with the son, indicating to her that minimal brain damage should be investigated, and she made appellant aware of that, and she did note that he had a problem with controlling his anger. Dr. Hausman asked the son if he was going to miss his daddy if he went to California, and he said "No", and gave as a reason that he was not as kind as Bill (Dr. Beard). The son thought that Dr. Beard would make a good daddy because "he is nice and sweet", gentle and loving. He did not think that he was too old. The son was very consistent, very strong, and very persuasive about wanting to be with his mother and Dr. Beard. The daughter expressed that Dr. Beard was nice and her father was okay, and her mother was nice. She did not think her other mom was nice and said that she did not like her. The daughter was asked, " 'Do you want to go with your father?' And she said 'no'. And I said, 'Why?' She said, 'He is not that kind; he is not that nice.' And she said, 'Sometimes Mother gets angry at me for no reason but she is good, she loves me and I love her.' " During the interviews, the children were clean and neat, healthy looking and were appropriately dressed. They were very loving toward Dr. Beard during the interview, sitting on his lap, reaching for him and asking him questions. They had good

eye contact with him and with their mother. Both children were required to work with the father in his rehabilitation work on an old home in St. Louis during the visitation period, and the daughter did not seem to sound very happy about that experience, and said she was not really wanting to go back there. The children seemed more stressed by their visits with their father than anything else. Dr. Hausman gave her opinion as to whether it would be in the best interest of the children to remain in the custody of their mother and with their stepfather (Dr. Beard): "A. I think that they would do very well for many reasons that I have described and that their development would continue to be optimum; and I think that that's their choice, their stated and implicit choice." As to whether the children's move to California would in any way be detrimental to them, Dr. Hausman gave her opinion: "A. I believe it would not be detrimental in the sense that they stated that they were eager to go to California, * * *. I think the parents intend to give the children a stable home, have discussed their plans with me and what they have already done in that direction. They have bought a home; the home is adequate in all ways; it is better than adequate, it is above average. They have good schools there. I am familiar with schools in both areas. I know the schools in California are at least as good, and in my opinion better than the schools here. I think their eagerness to be with their mother, their eagerness to move, and the medical supports that are available there, the fact that their parents have already established liaison with adequate medical supervision there, the fact that Dr. Beard will be back and forth on occasion because of his ties with this area [The University of Missouri at Kansas City Medical School], I think, will allow the children continuity here, if they need it. I just can't see any really authentic objective reason why it wouldn't be a good move."

Respondent produced evidence that on the 1982 summer visitation of the daughter, she arrived with a vaginal infection caused by not properly bathing herself and which was of such severity that it caused her to cry when she urinated; that her pierced ears were infected on arrival at the Thanksgiving, 1982, visitation; that both children were dirty and in need of a bath on June 8, 1983, when they arrived for summer visitation, described by respondent's mother as to the son, as "crud" of long lasting duration. Appellant acknowledged that the daughter did on occasion have a vaginal irritation, and had been playing outside at a day school before being picked up for the 1983 summer visitation. All the other evidence, gleaned from testimony, of a number of classroom teachers, day school instructors, overwhelmingly establishes that appellant's children, while in her custody, were always clean, well-clothed, well-mannered, and were well-liked and getting along well with their peers. All of these witnesses testified that the children were never a discipline problem and never misbehaved. Both had high academic ability with excellent vocabularies. The son was in a speech therapy class and his problem improved during the course of the school year. There was evidence from respondent that when his wife and his mother picked up the children on June 8, 1983, at a day school, they were not then clean, but there was evidence that they had been outside playing for some time before being picked up. On going into appellant's apartment to get the children's luggage, respondent's mother found it to be cluttered, unclean, with an odor. There was, however, evidence that the apartment had flooded a short time before which accounted for the odor.

Of course Dr. Beard is some thirty years senior in age to appellant. There is, however, no evidence that he is a person unfit to be around the children. The evidence is to the contrary that he is a kind, gentle person, with great interest in the children. They obviously are fond of him. Appellant's marriage to him was her choice and her right. There is nothing in the fact that he had been thrice married that would impugn his character, nor is there anything about the fact that he had changed jobs, all

within his medical profession, which would evidence any lack of stability. The home which will be provided in Long Beach is obviously a better living environment for the children than that of respondent, which, although in an area undergoing salutary rehabilitation of older homes, is in a high crime area. The schools in the Long Beach area are equal to, if not better than, those in the St. Louis area where respondent resides, and appellant and Dr. Beard have made arrangements for medical care of the children, especially for the son because of his speech impediment and possible minimal brain damage.

The trial court placed emphasis upon the fact that Dr. Hausman was hired by appellant and concluded that therefore she would favor appellant's position, as contrasted with the unpaid deposition testimony of psychologist Bette Jean Weisman who interviewed the children at the request of respondent's wife. Ms. Weisman did not do extensive mental and psychological testing of the children as did Dr. Hausman, and she did not have access to the children's school records, which are in evidence and which reflect excellent progress and adjustment while the children have been in appellant's custody. Ms. Weisman did conclude that the children needed a stable environment, but the whole of the evidence shows that to be what they have possessed while in appellant's care. There is one important factor which came into evidence without objection in the testimony of Dr. Hausman. That is that both children expressed a positive preference to be with their mother and to move to California, and not be in their father's care. This is one of the factors to be considered in adjudging custody under § 452.375(2), RSMo 1978. These children, being obviously very bright mentally, are capable of making that decision in the light of the evidence that they had been in a stable, happy and well-cared for situation with the mother. Although the children were available to the trial court for interview, the record does not show that was done. Accordingly, great weight must be given to the expressed preferences of the children, although that is not conclusive. Respondent did not show such a change in circumstances such as to give definite promise that the change will benefit the children in a substantial way. *Schmidt v. Schmidt*, 591 S.W.2d 260, 262[1–3] (Mo.App.1979), and cases cited. What seems to have precipitated respondent's motion was appellant's marriage to Dr. Beard and her requested permission to move the children to California, neither of which facts are shown to be detrimental to the children. Indeed, the move to California appears to be in the best interests of the children and should therefore be permitted. *In re Marriage of Wofford*, 589 S.W.2d 323, 326[5, 6] (Mo.App.1979), and cases cited.

There is one other fact shown by the record and admitted by respondent and his present wife. During the summer of 1982, she took showers in the nude with both the son and the daughter, and respondent similarly bathed with the daughter. Thereafter, the son drew pictures of naked women at the day care center, which was adjudged by an expert to be inappropriate behavior for a child of his age. These bathings were purportedly done to instruct the children properly to cleanse themselves, but this court well knows that such exposures should not be made with children of these tender years. There are other ways to instruct children in cleanliness.

Upon the whole record, this court is convinced that the judgment is against the weight of the evidence and entertains the firm belief that it is wrong. *Murphy v. Carron*, 536 S.W.2d 30, 32[1, 3] (Mo. banc 1976).

The judgment is reversed with directions that appellant's award of custody of the two children be reinstated; for an order that she be permitted to move them to the state of California; and for an order that the original award of $600.00 per month for child support be reinstated pending further review of that issue. Further proceedings should be had on the issue of child support considering what the support needs for the children will be in California; upon the issue of appellant's entitlement to an award

of attorney fees in this proceeding; and for fixing visitation privileges, and who shall bear the cost of transportation therefor.

All concur.