**Bridget E. NEWELL, Respondent,**

v.

**Lance Allen RAMMAGE, Appellant.**

**No. WD 56114.**

Missouri Court of Appeals,
Western District.

Nov. 9, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 21, 1999.

Application for Transfer Denied
Jan. 25, 2000.

Christopher T. Patterson, Kansas City, for Respondent.

Craig D. Ritchie, St. Joseph, for Appellant.

Before: Presiding Judge LAURA DENVIR STITH, Judge LOWENSTEIN and Judge RIEDERER.

LOWENSTEIN, Judge.

Lance Rammage ("Father") appeals from a judgment modifying a decree of joint legal and physical custody, granting Bridget Newell ("Mother") primary custody of their two minor children, Amber, age seven, and Lance, Jr., age five. Father contends the trial court erred in granting Mother primary physical custody of the children; authorizing Mother to relocate with the children to Illinois to live with her new husband; increasing child support; and failing to grant Father additional, specific visitation. For the following reasons, the judgment of the trial court is reversed and remanded, for further findings regarding the best interests of the children.

## FACTS

The facts in this case are almost free from dispute. Although never married, Father and Mother lived together from the time of the birth of their first child in July 1992, until their "separation" in October 1996. Paternity has never been an issue in this case. (Father was actually still legally married to a woman named Becky Collins, from whom he had been separated for ten years.) In November 1996, Mother and Father entered into a stipulation (pursuant to the Uniform Child Custody Jurisdiction Act, Section 452.440—.550, RSMo 1994) providing for joint physical and legal custody. Father agreed to pay a total of $150.00 per month in child support to Mother.

In January 1997, the Circuit Court of Platte County entered an Order, which basically adopted the parties agreement— Mother and Father were to have joint custody and control, with Father to pay $150.00 in child support per month. The parties operated under this agreement and Order until the time of the modification hearing in April 1998. The evidence showed that during this time, both parents were actively involved in the children's lives, and shared the time on a fairly equal basis. Both parents were cooperative and willing to deviate from the schedule when necessary to accommodate the other's needs.

Approximately two months after this couple's "separation," Mother became engaged to Mr. Newell. They married in June of 1997. Their intention at that time was for Newell to leave his job in Chicago and find a job in the Kansas City area. Newell, a union carpenter, was making approximately $50,000 per year. The move to Kansas City would result in a pay cut for Newell, but "it was something [he] could live with." He was planning to sell his house and move once he finished some remodeling. Although Newell's family is in Chicago, Mother and Newell were planning to live in the Kansas City area so that the children could remain near Father and their friends, and because the children had grown up here. Mother's family in Chicago includes three brothers, a sister, and grandfather. Father was the only relative of the children in Kansas City.

In August 1997, Mother was laid off from her job, where she had been working since May. Mother's attempts to seek new employment were limited to a single visit to the unemployment office to check with Job Services, looking in the newspaper, and contacting a "head hunter." Mother has an associates degree and has had classes relating to both computers and air-

line ticketing. In addition, she has experience in customer service manager/sales and in bookkeeping. She worked at a Golden Corral Restaurant for two months, which was the only job for which she had made application. In October, Mother took a part-time consulting job, and no longer sought other jobs in the Kansas City area. This job, as an independent contractor for Chicago Lamp, allowed her to be in Chicago two weeks out of each month, and spend the other two in Kansas City with her children. The job would convert to a full time position at $32,000 per year, once Mother was able to do so.

Father works for Michelin Aircraft Tire Corporation, where he makes approximately $37,000 per year. Although Father has little formal education, having only attended school up to the seventh grade, he is trained and experienced in working with lasers, a very specialized skill. Father works as an Allographer Technician and does testing on aircraft tires and maintains a laser. He is also responsible for networking and maintaining computers.

Newell injured his rotator cuff, and was off work and collecting disability from September 1997 through January 1998. This, in addition to Mother's offer of full-time employment in Chicago, resulted in their decision to live in Chicago, rather than Kansas City. Further, Mother stated at trial that whether or not she was granted permission to remove the children from the state would not affect her decision to personally move to Chicago. When Father learned of Mother's plans to relocate to Chicago, he filed his motion to modify. A few days later, Mother filed a motion to modify and requested permission to move the children to Illinois. After discovering that Father had already filed his motion, Mother substituted her Answer and Cross–Motion, seeking primary physical custody and permission to remove the children from the state.

Father, at the time of the hearing, was in the process of obtaining a divorce from Becky Collins, and was engaged to Susan Szalawiga, who lived in Olathe, Kansas. They were to be married in July 1998. Szalawiga is a Clinical Coordinator in the Maternal Child Health Department, and is a registered nurse with experience in "well and newborn" and in an intensive care nursery. With her flexible schedule as Coordinator, she was able to work between taking her children to school every day and picking them up, and was able to finish her work at home. Szalawiga has two girls, the youngest is about Amber's age, and they play well together. The older daughter is very "mothering" toward Lance, Jr. After their marriage, and if the joint custody arrangement were kept in place, the couple had planned to set up their home in the Park Hill School District, closer to where Mother had lived.

The evidence was uncontroverted that the older child was involved in extracurricular activities such as Brownies and gymnastics as well as school and church activities in the Kansas City area. Further, Father, who cooperated with Mother, was involved in those activities and took the children to and from many of them. Mother said the oldest child, Amber, was doing fairly well in school, and was improving her grades with each quarter. The testimony from Mother was candid in that she readily acknowledged Father loved the children and had a strong relationship with them and it was in the best interest of the children to be with him fifty percent of the time. In her estimate, during the period that followed their agreement on division of the parenting, he had spent some 111 days with the children while she had them for 173 days.

Both sides readily admitted the other was a good, concerned parent.

The trial court, in its Judgment Modifying Custody, granted Mother primary physical custody,[1] with both parents re-

---

1. There were no findings supporting the con- clusion that Mother was the primary caregiv-

taining joint legal custody; allowed Mother to relocate to Chicago; ordered Father to pay $815 per month in child support, which would abate during the summer months when Father has temporary physical custody; and granted Father specific periods of visitation. The visitation schedule provided that Father would have temporary custody/visitation during the summer, starting two weeks after school let out, and continuing until two weeks prior to the beginning of the following school year, with Mother to have one weekend of visitation/custody during that time. In addition, Father was granted visitation during the children's spring break vacation. The parents would alternate holiday visitation, as they had been doing according to the original Paternity Order. There was no mention in the judgment regarding who would be responsible for the travel expenses, which would be necessitated by visitation between cities.

## STANDARD OF REVIEW

 A showing that the circumstances of the child or the child's custodian has changed since the prior decree of custody, is required for modification of a prior decree. *Jones v. Jones*, 903 S.W.2d 277, 280 (Mo.App.1995); Section 452.410, RSMo 1994. The burden of proving a change of circumstances sufficient to warrant a change of custody, is on the person seeking the change. *Ijames v. Ijames*, 909 S.W.2d 378, 380 (Mo.App.1995). A trial court's order modifying child custody must be affirmed unless there is no substantial evidence to support it, it erroneously declares the law, or it erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *Moore v. Moore*, 849 S.W.2d 652 (Mo.App.1993). In child custody matters, the trial court's determination must be given greater deference than in other cases. *Aston v. Aston*, 810 S.W.2d 720, 721 (Mo.App.1991). The judgment is

to be set aside as being against the weight of the evidence only if this court has a firm belief the judgment is wrong, and will affirm the judgment even if there is evidence which would support a different conclusion. *Carter v. Schilb*, 877 S.W.2d 665, 667 (Mo.App.1994). The "paramount concern is, of course, the best interests of the child." *Jones*, 903 S.W.2d at 281(citations omitted).

## MODIFICATION OF CUSTODY

Father's first three points on appeal relate to child custody, and will be considered together. Father contends that: (1) allowing Mother to remove the children to Chicago is not in the best interests of the children; (2) the trial court erred in modifying the joint custody arrangement, because Mother failed to show that there was a substantial and continuing change of circumstances; and (3) if modification was necessary, the best interests of the minor children would be served by granting Father primary physical custody.

The fact pattern in this case, and the disposition of his first point (whether or not the conclusion of the best interest test of the children to move was sufficiently supported by the findings of fact), makes Father's points two and three somewhat irrelevant. This case boils down to a determination as to Mother's motion to move the children out of the state.

 With regard to this second point, remarriage and the new spouse's residence and employment in another state, is the sort of substantial and continuing change in circumstances that will support modification if shown to be in the best interest of the child. *Maher v. Maher*, 951 S.W.2d 669, 672 (Mo.App.1997); see also *Jones*, supra at 280; *Shaw v. Shaw*, 951 S.W.2d 746, 749 (Mo.App.1997).

er. Alteration via modification of the existing decree of joint physical and legal custody was precipitated solely by the Mother's subsequent decision to move to Chicago. The first allega-

tion Father was doing less than fifty-percent of the parenting came after Mother had made the decision to move.

Father also contends that "if a modification was necessary, the best interests of the minor children would be served by granting primary physical custody to Father." "[T]he issue of whether a party should be· granted permission to move a child from the state is separate from the issue of whether custody should be transferred from one party to another." *Riley v. Riley,* 904 S.W.2d 272, 276 (Mo.App. 1995). If the court had denied Mother's request to remove the children from the state, and found that it would have been feasible for Mother to remain in Missouri, it would not have had to transfer custody to Father. *Id.*

The court now takes to the first, and most important issue in this case. Was the trial court's determination to allow Mother to remove the children from Missouri to take up permanent residence in Illinois, after consideration of the necessary factors to be considered and weighed, in the best interests of the children?

When determining whether to allow a parent to remove a child from the state, the paramount concern is the best interest of the child. *Puricelli v. Puricelli,* 969 S.W.2d 289, 296 (Mo.App.1998); *Carter v. Schilb,* 877 S.W.2d 665, 667 (Mo. App.1994). "Initially, we note that the best interests of a child are facilitated by continued interrelationships with both parents." *Jones,* 903 S.W.2d at 282. However, "[I]n our highly mobile society, it is unrealistic to inflexibly confine a custodial parent to a fixed geographical area...." *In re Marriage of Greene,* 711 S.W.2d 557, 564 (Mo.App.1986). Four factors have been identified as being relevant to the determination of whether to permit a custodial parent to remove a child from the state: (1) whether the prospective advantages of the move will improve the general quality of life for the parent and the child; (2) the integrity of the custodial parent's motive for the move; (3) the integrity of the noncustodial parent's motives for opposing the relocation, and the extent to which it is intended to secure a financial

advantage with respect to continuing child support; and (4) the realistic opportunity for visitation which can provide an adequate basis for preserving and fostering the noncustodial parent's relationship with the child if relocation is permitted. *Puricelli,* 969 S.W.2d at 296; *Jones,* 903 S.W.2d at 282; *Carter,* 877 S.W.2d at 668–9.

The first consideration is whether the prospective advantages of the move will improve the general quality of life for the parent and the child. It is difficult to determine whether the prospective advantages of the move to Chicago outweigh the current benefits to the children of remaining in Missouri.

Whether the general quality of life would improve is unclear. "While it may have been true a job with a steady and potentially increasing income awaited wife in Illinois, nothing in the record shows [Mother] could not find similar employment [in Missouri] had she attempted to do so." *Effinger v. Effinger,* 913 S.W.2d 909, 913 (Mo.App.1996). The only evidence of Mr. Newell's attempts to find employment here, is a phone call to the District Council of Carpenters, in which he was told he could make $19.50 per hour, compared to the approximately $25 per hour he makes in Chicago. While Mother continually maintained that the move was advantageous due to the income of both she and her husband, there was no demonstration the Newells' needs could not be met in Missouri. *Carter,* 877 S.W.2d at 667; *Puricelli,* 969 S.W.2d at 296–7. (Mother denied permission to remove children to Texas, even though she and husband would earn more money and child would be enrolled in private school). "The mere desire, verses the need to move is not sufficient." *Puricelli,* 969 S.W.2d at 297; *Carter,* supra at 667; *Jones,* 903 S.W.2d at 283.

Mother stated that she intends for Amber to attend St. William, a private school a few blocks from their Chicago home. Lance, Jr., will be in day care, while Am-

ber would require after-school care. Wife offered no evidence regarding the school's curriculum. In contrast, Amber was doing well in school here, and if the children were to remain in Missouri, Amber and Lance, Jr. would not need to be in day care or after-school care. Compare *Thomas v. Thomas*, 989 S.W.2d 629 (Mo.App. 1999) (Move found to be advantageous where Mother carefully selected new school and neighborhood, and Mother would be able to stay at home with children). Although the children have some relatives in Chicago, the children have lived here their entire lives; they have friends here and actively participate in many activities. See *O'Leary v. Stevenson*, 782 S.W.2d 109, 112 (Mo.App.1989); see also, *Tucker v. Tucker*, 778 S.W.2d 309, 312 (Mo.App.1989) (Denial of motion to remove children to Texas upheld). While it is not "clear whether the children's general quality of life would improve if they moved, it was clear their quality of life would not diminish if they stayed." *Effinger*, 913 S.W.2d at 913. (First factor found to favor Father, and denial of permission to remove children affirmed, where wife offered no evidence concerning schools or neighborhood and did not try to find employment in Missouri). Even viewing the facts and inferences in a light most favorable to the result, due to the lack of evidence relied upon by the court to show in what way the quality of the children's lives would be improved by the move, this factor, at best, only slightly favors Mother.

As to the second and third factors, both parents expressed nothing but concern for the best interests of their children. Both parents have shown interest in the children's activities and have made every attempt to foster significant and meaningful relationships with the children. Although Father does appeal the amount of increase in child support, there was no evidence this was his motive for opposing relocation. Father is actively involved in the lives of the children, making the most of his parenting opportunities. During the weeks that he had the evening shift at work,

Father attended school with Amber and had lunch with her a couple times per week. He took off work to attend parent-teacher conferences, and frequently drove the children to their various extracurricular activities. Mother's motive in moving to Chicago is to be with her new husband and accept the full-time position at Chicago Lamp, not to deprive Father of a meaningful relationship with his children. As to the parents' motives, these factors weigh evenly for both Mother and Father.

■ The fourth factor, the realistic opportunity for visitation, must also be examined. The cost of travel, the arrangements needed for minors to travel, whether flying or otherwise, and the time involved, are all relevant to this inquiry. *Jones*, 903 S.W.2d at 283. Although courts do not generally rule against the custodial parent on this factor, those cases most often involve situations where the parent requesting to remove the children from the state has primary physical custody. See *Riley*, 904 S.W.2d at 277. (Where Father did not take advantage of his current visitation opportunities); see also *Thomas*, 989 S.W.2d 629. (Where Father is non-custodial parent); see also *Shaw*, 951 S.W.2d at 749 (Held that visitation of non-custodial father could still be accomplished).

In joint physical custody situations, such as here, the courts have been less willing to find that there is a realistic opportunity for visitation which can provide an adequate basis for *preserving* and fostering the relationship with the parent opposing the move. In *Buschardt v. Jones*, 998 S.W.2d 791 (Mo.App.1999), this court found that the fourth factor weighed against removal, and reversed the trial court's decision. In that case, this court noted that the father, according to the joint custody arrangement, had previously had custody approximately fifty percent of the time and was "an active participant in" the life of the child, and if relocation were allowed, he would see the child "infrequently and [would] be unable to continue

participating in her school and activities." *Id.* at 798.

In *McElroy v. McElroy*, 910 S.W.2d 798, 803 (Mo.App.1995), another joint physical custody situation, the court held that the fourth factor weighed against removal; and upheld trial court's denial of permission to remove the child to Iowa. In *McElroy*, the parent contesting removal had been active in the children's lives by signing them up for sports, attending games, and participating in school conferences, as well as acting as a caregiver. *Id.* Also, courts have noted that such considerations as the feasibility and expense of travel during holidays, scheduling around the activities of the children, and time expended travelling between parent's homes, should be considered. See *Puricelli*, 969 S.W.2d at 297; see also *Carter*, 877 S.W.2d at 668.

In the present case, since the children are quite young, the time spent travelling could be overly taxing on them. Also, with children of their age, there would be some difficulty arranging for travel to facilitate visitation, as they are too young to travel alone. The fourth factor weighs in favor of Father, because if the children remain in the state, they can continue the meaningful relationship they have developed with him.

## CONCLUSION

 Mother is "not entitled to an order which permits removal of the child, just because she asks for one." *Carter*, 877 S.W.2d at 668. Mother failed to show that the needs of her family could not be met in Missouri; without more, the move appears unnecessary, and only a matter of convenience. Although we live in a mobile society, which requires the need for flexibility, "each case must be decided on its particular facts, and where the custody of a child is at issue, the child's welfare is the primary concern." *McElroy*, 910 S.W.2d at 802. Although the move to Chicago *may* be in Mother's best interest, the governing standard is that of the best interest of the *children*. *O'Leary*, 782 S.W.2d at 112. "Missouri courts presume that a child's frequent and meaningful communication with both parents is in the child's best interests." *Shaw*, 951 S.W.2d at 746. In the case at bar, the trial court's findings do not show sufficient evidence to overcome that presumption. The trial court in support of its judgment, stated only that Mother is the primary caregiver, Mother's family is in Chicago, and Mother has more formal education than Father.[2]

Without more articulated findings of fact, this court cannot rule that the move was in the best interests of the children.

This situation is not ordinary. This is not a father who exercises visitation every other weekend, having only limited meaningful contact with his children. This is a joint physical custody situation, in that both parents have the children approximately half the time. Father has participated in the children's school and extracurricular activities, and has made a genuine effort to spend quality time with them.

2. The findings set out below are from the legal file.

4. Subsequent to the Court's previous order, the minor children were spending a majority of time with the petitioner; 61 percent according to the Petitioner and 54 percent according to the Respondent. In addition, Petitioner has been taking responsibility for an approximate equal amount of the children's extra-curricular activities. The difference is wide enough for the Court to consider Petitioner as the actual primary caregiver of the children.

8. The Petitioner has a step-grandfather in Chicago, and Petitioner's husband has numerous family members, all able to provide support for the Petitioner and the minor children. The Respondent has no family support in the Kansas City area, other than his fiancé, Susan Szalawiga.

9. Petitioner's motives for relocating the children to Chicago were not to deprive the Respondent from visitation with the minor children but were for economic and emotional betterment of her and the children.

13. Petitioner has an associates degree while Respondent has only completed the sixth grade. Petitioner is better equipped to help the children advance in their education.

The children were doing well in Missouri, had friends and activities and had the advantage of both parents. With the move of Mother, the situation will change.[3]

This case involving the move of a parent presents a most difficult decision. Under the factors to consider, particularly two and three, neither parent is a villain or has shown any vindictive or untoward motive in dealing with the other parent. After their separation they entered into, and generally followed, a mutual plan to responsibly parent their children. In reversing and remanding this case for making more specific fact findings as to the four factors for removal, this court is not unmindful of the trial judge's efforts in rendering a decision on this delicate and yet very important matter in the parties' lives. Yet, in a case of joint physical custody, where one parent petitions the court to change custody, and remove the children from the state, there must be more in the way of findings as to the four factors to support a decision to grant such a motion than was found in this judgment.

Without a weighing and balancing, and trial court reliance on the facts pertaining to the four factors, it is impossible to reach a conclusion as to the all-important best interest test. In making the decision as to the move, the opinion in *Buschardt v. Jones*, supra at 798 is helpful. It stated that the non-moving parent in a joint physical custody situation had been an "active Participant" in the child's life and would see the child less frequently, "and be unable to continue participating in her school and activities." The opinion continued on to say the parent had a "close relationship ... that would be strained by the move," and concluded by noting that even under the deferential standard given to the trial court's decisions regarding child custody, the judgment allowing the move could not stand.

Father's remaining points need not be addressed. The judgment is reversed and remanded to the trial court for the limited purposes of: 1) amending the pertinent findings and conclusions and portion of the judgment pertaining to the best interest test, and 2) receiving evidence as to the cost and allocation of travel expenses of visitation of mother's motion to move is allowed. All other respects of the decree are affirmed. Costs are to be divided equally.

All concur.

3. The following is testimony of Mother:

A. And we were trying to keep everything together for the kids' sake, as far as Lance was concerned.

Q. Okay, so that was something that you considered was to keep the contact between Lance and the kids?

A. Yes.

Q. And that was for Lance's benefit?

A. It was for the children's benefit.

Q. And also to allow the kids to keep having their friends here in the Kansas City area?

A. Yes.

Q. And also to allow Amber to continue in school here?

A. Yes.

Q. So you felt that those things and those factors were important for the kids, at that time, is that right?

A. To a degree, yes.

* * * * * *

Q. If this Court doesn't allow you to take the kids out of state and—well, let me just ask you this: If the Court doesn't allow you to take the kids out of state, are you gonna stay here or are you gonna go on to Chicago?

A. I don't have any other choice but to go on to Chicago.

Q. So you'll go ahead and leave the kids here with Lance and you'll go on up there and work?

A. Yes.

Q. You wouldn't apply for a job here in the Kansas City area?

A. I already have a job up there.

Q. Why don't you have a choice between going to Chicago and staying here?

A. Why don't I have a choice?

Q. Yes.

A. There's a choice, but in the weighing of everything, it's better for me to move there with the children.